IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### NOVEMBER TERM, 1883.

---

### GIBBS AND STANTON v. STATE.

1. That some of a grand jury were liable to a principal challenge, or the fact that the jury had been impaneled for a malicious purpose by the sheriff, will not constitute a ground of a plea in abatement to an indictment.

2. The remedy in such case is to challenge before indictment found, or to move to quash afterwards.

3. Even if such matters were pleadable, they would not lay ground for reversal, in view of the statute declaring that no criminal judgment shall be reversed on error except for some matter that may have prejudiced the defendant in his trial.

4. When a judgment sentences a prisoner to the state prison, it is not necessary for it to expressly state that such prisoner be put to hard labor.

5. On writs of error in criminal cases, it is competent for the court, in its discretion, to require, by *certiorari*, the trial court to send up a corrected or fuller return of its proceedings and judgment.

---

On error to the Sussex Sessions.

379

The defendants were indicted for a libel, and being arraigned they pleaded in abatement ill-will and malice on the part of certain of the grand jurors, and malicious misconduct in the sheriff in selecting and summoning such jury. The state demurred to that plea, and the Sessions, upon argument, sustained the demurrer

Argued at June Term, 1883, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, VAN SYCKEL and KNAPP.

For the plaintiffs in error, *M. Rosenkrans* and *J. D. Bedle.*

For the state, *Theodore Simonson* and *L. Cochran.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. In disposing of the questions presented to the court for solution in the present case, it will be assumed that the plea which has been demurred to is sufficient in form, and that it exhibits the fact that the grand jury officiating on this occasion was not such a one as the law requires. The indictments found by such a body would, on application to the court, have been quashed. The point of inquiry is whether they can be annulled or defeated by means of a plea in abatement.

The subject is one concerning which there is much difference of judicial opinion, and the text-books treat it as a vexed question. That the prisoner, before he has pleaded, has the legal right to appeal to the discretion of the court to quash the indictment on account of the illegal composition of the grand jury, or of the misbehavior of the sheriff in selecting it, is everywhere admitted. But there are authorities enforcing a doctrine in advance of this, and which declare that it is the prerogative of the party charged with crime to demand, as his legal right, that the procedure against him, having this illegal origin, should be abated. These decisions are derived from the theory that the modes of accusation leading to arraignment are to be guarded with the same painstaking as the law re-

quires with respect to the methods of trial. This was the view emphatically advanced in the case of *Doyle* v. *State,* cited by counsel from 17 *Ohio* 225, in which the matter decided was that it was a good plea in bar to an indictment that one of the grand jurors had not the statutory qualification. In the opinion of the court we find the following expressions, viz.: "But it is said the objection comes too late. No objection can come too late which discloses the fact that a person has been put to answer a crime in a mode violating his legal and constitutional rights. The doctrine of waiver has nothing to do with criminal prosecutions. No person can be put to a defence on the charge of crime, or be convicted of crime, except in the exact mode prescribed by law. And whenever it shall be made manifest, in the progress of a criminal prosecution, that the legal rights of the person charged have been violated, the court will permit the accused to have the benefit of the error." But that such theories as this are extreme and impracticable will plainly appear when we consider that if adopted they would involve the right to interpose a plea at any stage of the trial and even after conviction, founded on the illegal organization of the accusatory body, provided such illegality was not discovered at an earlier period in the proceedings. It is entirely fallacious to assume that a man cannot be tried except in accordance with the prescriptions of the law, for if his rights are not asserted at the proper time and in the proper mode, they will be entirely ignored. When a legal right exists, a correlative method for the protection and enforcement of such right also exists in our legal system; but, nevertheless, it will be found, upon examination, that most of such methods are imperfect and incomplete; they are usually founded on compromises between considerations of public and private utility. So that when it is said that the right which the law affords a person who is charged, or who is likely to be charged, before a grand inquest with the commission of a criminal offence, to put in challenges to individual jurors or to the array, is an imperfect protection, such a position may be granted without much affecting the inquiry. It would not

follow that because of such imperfection it must be implied the person in question has the right, upon the finding of a bill, to avoid it by a plea containing the subject matter of a challenge. Reasoning a priori, upon general principles, it would seem that such a course would be inadmissible, for if a challenge be transformed into a plea the novel proceeding of trying such a subject before a jury instead of before triers would occur, and a formal trial would be substituted for a summary one. Considering the case at large and without reference to the real question, which is, as I apprehend, what is the practice and procedure marked out by the law with regard to this matter, it is clear that this question has two sides, which should both be duly considered. The remedies which the law afforded these defendants, situated as they were, were these: First, they had the right to challenge this grand jury, either as a whole or in part, on the grounds now stated in their pleas; or, second, if an opportunity for doing this was not afforded to them, by reason of their ignorance that they would be proceeded against, or that the objections to the proceedings in question existed, then their right was to apply to the court, in the exercise of its discretion, to quash the entire procedure against them. Nor in abstract speculation would an argument of any force arise from these premises that the remedies thus provided are so utterly insufficient and unreasonable that it must be presumed that a further remedy exists. For my part I can see no force whatever in such a suggestion. In the first place, we are to remember that the right in question, and which, in some measure, the law should assuredly secure to the party, is not one that can be called an essential or fundamental right; it is not one necessary for the security of the person, life or property. The requisite that an accusation of this nature shall proceed from a grand inquest is the provision which the law makes against frivolous or malicious public criminations. The safeguards to such provisions, as I have said, consist in the right to challenge the grand jury and the right to move the court to set aside the proceedings. Are such safeguards unreasonably deficient? I am at a loss to

see how any one can so consider. If a man is tried for his life and is convicted, and he then discovers that by the malice of the summoning officer the jury has been packed, and the trial has been a scheme to take his life, what remedy does the law give him in such an extremity? Absolutely none but an application to the discretion of the court to set the proceedings aside; and yet it is argued that this same remedy is inadequate in its application to a similar proceeding on the part of a grand inquest. I must repeat that I cannot concede that a right to put in the plea in question belongs to the defendants *ex debito justitiæ*. If it be a right, it must be one inherent in the established modes of legal procedure. And this I regard as the real question to be disposed of on this branch of the case.

There are three decisions in this court upon this subject, the first of these being that of *State* v. *Rockafellow*, 1 *Halst.* 332; and in that case it was adjudged that it was a good plea in abatement in a criminal prosecution that one of the grand jurors by whom the bill was found was not a freeholder, as was directed by the act of assembly. The opinion of Chief Justice Kinsey, which was read on that occasion, was not to the effect that by the common law a plea of the character of the one then in question was justifiable, but the result just stated was arrived at on the single ground that the statute required certain qualifications in a grand juror, and that it was consequently a "reasonable and lawful answer to an accusation that it had not been preferred in the manner or by the persons, which the law recognizes." Some stress was also put upon the fact, which was admitted by the demurrer in that case, that the unqualified juror was one of the twelve jurors requisite to the finding of the bill. It is consequently manifest that this authority does not sustain any proposition but one to the effect that when a statute requires a certain qualification in those finding a bill, an irresistible presumption will arise that it was the legislative intent to make absolutely void any bill found by persons not being possessed of such qualifications. As the statute by necessary implication avoided the bill, a plea in abatement was

a proper method to evince to the court its nullity. In the views expressed by the court there is no allusion to any existing common law practice on the subject, nor is any authority referred to, the matter being treated as a pure question depending on the proper construction of the statutory law.

Next in this line of decisions stands that of *State* v. *Rickey*, reported in 5 *Halst.* 83, and in this the court declares that the doctrine promulged in the case just referred to might lead to very inconvenient results "if carried a single inch beyond" its precise circumstances. In this case of State *v.* Rickey, it was declared that a plea in abatement to an indictment could not be supported, the substance of the plea being "that two of the persons sworn and charged as members of the grand jury had, before they were sworn, formed and publicly expressed opinions that were unfavorable and prejudicial to the defendant, by declaring their determination to have him indicted, and by declaring that nothing else would have induced them to attend the court at that time." The court declared that it found "no principle on which to maintain the plea," and after alluding to the many public inconveniences that would attend such a practice, said that "there is no such plea as this to be found among the records and muniments of the law. It is *sui generis*, not alone without precedent (whereof the books had been filled if past ages had deemed such matter pleadable), but contrary to all precedents."

This decision seems to me in point in the present inquiry, for, although in the one reported the exception set forth to the jurors was ground of challenge to the favor, and in the present instance the facts alleged constitute a principal challenge, it appears to be out of the question to differ the two cases by reason of such a lineament; both species of challenge are required, by the course of the law, to be interposed at the same time. They are triable by the same summary method, and are attended by the same result, for if they are sustained they equally disqualify the jurors at whom they are respectively aimed. To permit the substance of one of such challenges to constitute the body of a plea in abatement, and to

deny to the other the same faculty, would be to found judicial action on a mere verbal distinction.

The last of the three cases before mentioned bears a similar aspect. It is that of *State* v. *Dayton*, 3 *Zab.* 49. The adjudication was to the purport that the court could in its discretion, when the administration of justice required it, quash an indictment for the misconduct of the grand jury, but that if such body found an indictment upon illegal evidence, or without legal evidence, such misbehavior could not be taken advantage of by motion to quash, plea in abatement, or in any other way.

Nor do I think that these decisions, which disallow pleas founded on irregularities or errors in these preliminary procedures, are in any respect out of harmony with the practice at the common law. Upon a careful investigation in this respect, I do not think there is any solid reason for believing that ever under the prevalence of that system, a plea of this nature was sanctioned; and that it was not until the passage of the act of 11 *Hen. IV.*, c. 9, that such a course of law was deemed admissible. This statute was enacted during the running of Hilary term of the King's Bench, and during that term it was held by the court in a case reported in the Year Books, 11 *Hen. IV.*, c. 41, that a person outlawed on an indictment of felony, might plead, in avoidance of it, that one of his indictors had been outlawed for felony. It has been generally supposed that this decision was grounded on the statute just referred to, and which act declares that all indictments found by persons other than those described in it, or by corrupt practices denounced by it, shall be absolutely void. A case, therefore, being within the purview of this law, it is obvious that the nullity of the proceeding could be set up in the form of a plea. Hawkins, in his *Pleas of the Crown, vol. 4, book 2, ch. 25, § 18*, faintly raises a query whether this decision in the Year Books was based on this act of parliament or on the common law, his reasons for such doubt being the proximity in time of the passage of the act and the decision, and the fact that the judges in announcing their judgment do not allude to the statutory law. But these grounds do not

appear to be sufficient to call in question the general opinion which he says then prevailed, that this judicial resolution was founded on the act; for if no reference is made in the report in the Year Book to such act, neither is any reference made to any rule of the common law, the report of this point is comprised in two lines, and does nothing more than to express the judicial judgment. And with respect to any inference to be drawn from the proximity in time of the passage of the act of parliament and the decision, it seems to me that it is much more reasonable to deduce from such a state of things the inference that the act formed the basis of the judgment, rather than to conclude that the very remarkable coincidence occurred of the legislature and the court, about the same time and acting independently of each other, declaring the same mode of proceeding to be void.

Nor, as I apprehend, are the views of Lord Coke on this subject left in the least uncertainty. It will be noted that unless, at the common law, an illegality in the formation or proceedings of the grand jury had the effect to render null its findings, a plea setting up such matters would have been plainly bad; yet it is clear beyond all gainsaying, that in Lord Coke's understanding, it was not the common law but this statute of Henry IV., that had the distinctive effect in question. In *Scarlet's case*, reported in 12 *Rep.* 98, he expresses himself with perspicuity on the point. The prisoner was indicted in that case for maliciously getting himself returned as a grand juryman, which was one of the practices condemned by the statute of Henry IV., above referred to, and Lord Coke analyzes the act, and says "that it is partly affirmative of the common law and partly a *new law.*" He then proceeds to show that it is "affirmative of the common law" when it directs that no indictment shall be found "by any person named to the justices, but by the inquest of lawful people of the king, returned by the sheriff." And in conclusion, he declares that "the said act 11 Hen. IV., hath made a new law, *scilicet*, that any indictment found against the act shall be void." It will, therefore, be observed that in sub-

Gibbs and Stanton v. State.

stance the great common law commentator says this: That by the common law an inquest was required to be held by the king's lawful liege people—*probi et legales homines*—and not by persons who obtained themselves to be nominated for malicious purposes, and to this extent the statute in question was in affirmation of the existing law; that the common law did not, by reason of the grand jury not being constituted in this manner, avoid the indictments which were found, but that the act referred to had that effect, and was in this particular introductory of a new rule of law.

And that this was the point of view in which the subject was regarded by the judges in *Withipole's case, Croke Car.* 134, is apparent from the entire scope of the discussion. The plea in that case was that one of the grand jury had nominated himself, and another had been outlawed, and was, therefore, not *probus et legalis homo.* Nevertheless, the consideration of the matter went entirely on the meaning of the act of parliament, and made no allusion to any general principle of law that could be considered applicable to such a defence.

I will further remark that the view above expressed is sustained by the learned author of *Bac. Abr.,* tit. *"Juries,"* p. 33.

The plea in this case is not maintainable, and was properly disposed of in the Court of Quarter Sessions. Nor will the circumstance that such plea has been demurred to add anything to its legal efficacy, for the obvious reason that the confessions involved in such an issue admit only the existence of facts which do not, *ipso facto*, annul the indictment, as they would do if the act of *Hen. IV.* were in force in this state. Accepting as the truth all the facts spread upon this record, it appears merely that grounds existed upon which to base an application to the court to quash this indictment.

But before closing this branch of the case it is proper, in order to avoid misconstruction, that I should say that even if the legal flaw in these proceedings existed, as the counsel of defendants contend, nevertheless, in my opinion, the judgment could not be reversed on that account. An error either of substance or of form which will work the reversal of a crim-.

inal judgment under the legal system of this state must be of
such a nature that it either did, or at least might have, preju-
diced the defendant on the trial of the case. The provision con-
tained in the eighty-eighth section of the Criminal Procedure
act is to the effect that no judgment given upon any indictment
shall be reversed " for any error except such as shall or may
have prejudiced the defendant in maintaining his defence upon
the merits." In the case of *Hunter* v. *State*, 11 *Vroom* 496, it
was held that this regulation applied to matters of substance
as well as to matters of form, for it was there ruled that if
illegal testimony was admitted against the protest of the pris-
oner, the trial was not thereby illegalized, it being shown
plainly in the record that such error could not possibly have
impaired the defence. In the case now before us the defend-
ants were convicted on their own confession, and it is conse-
quently undeniable that the alleged imperfections in the
preliminary proceedings could not have prejudiced them upon
such a trial.

The second exception which has been taken to the proceed-
ings in this case is one that is supposed to reside in the judg-
ment itself.

The first return which the Quarter Sessions made to this
writ of error consisted of a duly certified copy of the pro-
ceedings as they appeared in the minute-book of that court.
No formal record had been made up, and from the first return
it appears that the judgment pronounced on Stanton was that
he was to " be confined in the state prison for the term of
six months, and that he pay a fine of fifty dollars, and that he
be confined after his imprisonment until the fine and costs are
paid." To this it is objected that there is no judgment that
the defendant be put to hard labor, and that he cannot be
sent to the state prison unless such penal consequence be
adjudged to be a part of his punishment. But no reasonable
ground can be assigned for such a construction. Hard labor
is a component part of confinement in the state prison, and
therefore, when the sentence is to subject the prisoner to such
a confinement, it necessarily follows that he is thereby con-

Gibbs and Stanton v. State.

·demned to hard labor. Many of the statutes of this state, in their adjustments of punishments to the various crimes, are· couched in terms similar to those constituting the sentence in question; thus, in section 150 of the Crimes act it is declared that the offender therein designated "shall be punished by a fine not exceeding five thousand dollars, or imprisonment in the state prison not exceeding five years." And from this expression does it not inevitably and plainly follow that the convict is to be under a confinement at hard labor? If, consequently, this question were to be determined in the entry in the minutes, as it was first certified to this court, the verbal criticism in question would not prevail against the judgment.

But this case in this respect does not stand on such a footing, for upon the return, as above stated, having been made, this court, at the instance of the state, granted a *certiorari* to the Sessions, "requiring the record in the case to be certified more fully and truly;" and in obedience to this mandate a second return was made, and from which it appears that the return is in the ordinary form in the particulars above mentioned. This latter return is in the guise of a formal record of the proceedings and judgment, and to this it is objected that it has been promulged since the issuing of the writ of error, and that the Sessions had not the legal power to alter its original judgment. But this objection assumes a fact that does not exist; there is no ground to suppose that the court below has altered any part of the judgment actually pronounced by it; what it has done, is to depart from the clerk's entries in its minutes in formally entering its judgment. I am not aware that it has ever been held in any court, that the mistakes of its clerks in making entries in its book of minutes operate as an estoppel to the court, when it comes to the act of having its judgment entered as it was in point of fact pronounced. But that such a control over its records exists, and that this court can properly send down a record of the Sessions, after writ of error brought, for the purpose of subjecting it to such control, I consider to be questions settled by the past decisions of this court. *State* v. *Society*,

&c., 13 *Vroom* 504; *Stone* v. *State, Spencer* 404; *West* v. *State,* 2 *Zab.* 212; *State* v. *Norton,* 3 *Zab.* 33; *Nicholls* v. *State,* 2 *South.* 539.

This exception must be overruled.

With respect to the last point raised by the counsel of the defendant, which relates to that part of the sentence which declares that the sentence is to begin and run concurrently with "three other sentences this day pronounced against the defendants," it is enough to say that the judgment in this respect is in accordance with the long-settled practice in similar cases, and that by such a course, in the opinion of the court, no uncertainty with respect to the time of the beginning or the ending of the sentence is superinduced. *Id certum est quod certum reddi potest,* is the applicable maxim.

Let the judgment be affirmed.